THE LAW OFFICES OF MATTHEW L. OWENS, ESQ., LLC
Matthew L. Owens, Esquire
PA ID No. 76080
4409 North Front Street
Harrisburg, PA  17110
717-909-2500
Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JERI LYNNE DIMOFF, | ) CIVIL CASE NO. |
| Plaintiff, | ) |
| | ) JURY TRIAL DEMANDED |
| v. | ) |
| | ) |
| CHAMBERSBURG PENNSYLVANIA | ) |
| STATE POLICE, TROOPER LUCAS | ) |
| AMAROSE, TROOPER CONOR | ) |
| TREMAINE, and JOHN DOE | ) |
| SUPERVISORY OFFICERS, | ) |
| Defendants. | ) |

## COMPLAINT

## PRELIMINARY STATEMENT

1. Plaintiff Jeri Lynne Dimoff files this action for severe and permanent injuries sustained as a direct and proximate result of the reckless, wanton and willful actions of the Pennsylvania State Police and its officers, agents and/or employees, which and who deprived Plaintiff Dimoff of her civil rights.

**JURISDICTION**

2.  This Court has jurisdiction over the subject matter of this Complaint under
    42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and
    1367(a).

**PARTIES**

3.  Plaintiff Jeri Lynne Dimoff, (hereinafter "Dimoff") is an adult individual
    who resides in Chambersburg, Pennsylvania and suffered serious and
    permanent injuries following an arrest on or about January 26, 2019.

4.  Defendant Chambersburg Pennsylvania State Police (hereinafter "PSP")
    was at all times relevant a municipality duly organized and existing under
    the laws of the Commonwealth of Pennsylvania with its principle office or
    place of business located at 3800 Black Gap Road, Chambersburg, PA
    17202.

5.  Defendant Trooper Lucas Amarose (hereinafter "Amarose") is an officer
    for the Chambersburg Pennsylvania State Police who was on duty of
    January 26, 2019. Defendant Amarose was at all times relevant an
    employee and agent of the Chambersburg Pennsylvania State Police,
    acting within the scope of his authority, under color of state law.
    Defendant Amarose is sued in his official and individual capacity.

6. Defendant Trooper Conor Tremaine, (hereinafter "Tremaine") is an officer for the Chambersburg Pennsylvania State Police who was on duty of January 26, 2019. Defendant Tremaine was at all times relevant an employee and agent of the Chambersburg Pennsylvania State Police, acting within the scope of his authority, under color of state law. Defendant Tremaine is sued in his official and individual capacity.

7. Defendant John Doe Supervisory Officers (hereinafter "Officers"), were officers for the Chambersburg Pennsylvania State Police who were on duty of January 26, 2019. Defendant Officers were at all times relevant employees and agents of the Chambersburg Pennsylvania State Police, acting within the scope of his authority, under color of state law. Defendant Officers are sued in their official and individual capacity and were supervisory officers of the Defendants.

## DEFENDANTS' DUTIES AND RESPONSIBILITIES

8. Defendant PSP is responsible for setting policy, procedures and directives for the operation of the Borough and its police force, including, without limitation policies and procedures for the selection, evaluation, training and supervision of police officers employed by PSP, and to ensure that policies, procedures and directives established are enforced for the exercise of their police duties.

9. Additionally, Defendant PSP is responsible for the review and supervision of the actions of individual officers to ensure that they conform to established policies, procedure and/or guidelines including whether they were discharging their duties in an appropriate and lawful manner consistent with policies and procedures.

10. Defendant PSP was at all times relevant hereto charged with the enforcement of the laws of the Commonwealth of Pennsylvania in a fair, just and equitable manner consistent with the rights afforded all individuals by the Constitutions of the United States of America and the Commonwealth of Pennsylvania.

11. Defendant PSP was also charged with setting and/or interpreting policy, training and supervision of officers under his command including but not limited to when, under what circumstances, and in what manner an officer is permitted to engage in a vehicular stop or chase.

12. Defendant PSP was also responsible for the review and supervision of the actions of individual officers to ensure that they were conforming to established policies, procedures and/or guidelines including whether they were discharging their duties in an appropriate and lawful manner consistent with policies and procedures and if officers violate the Constitutional Rights of Borough residents and others.

# FACTUAL ALLEGATIONS

13. Plaintiff Dimoff was an adult individual at the time she suffered serious and permanent injuries as a result of the actions of the Chambersburg Pennsylvania State Police Department and its officers, specifically Defendants Amarose, Tremaine, and John Doe Officers 1, 2 and 3.

14. Plaintiff's injuries were precipitated by an arrest between Plaintiff and Amarose, Tremaine and John Doe Officers on January 26, 2019.

15. By way of background, on January 26, 2019, Plaintiff Dimoff was driving her son home from a friend's house with the family dog in the car.

16. Unfortunately, Dimoff was pulled over by the PSP for allegedly weaving into the other lane of traffic and crossing traffic lines.

17. Plaintiff Dimoff upon seeing the police units pursuing her turned left into a church parking lot.

18. Dimoff and her son removed their seatbelts to secure the dog in the backseat as the dog was whining and trying to jump in the front seat with Dimoff.

19. PSP conducted a traffic stop and identified through PennDOT records that the driver of the vehicle, Plaintiff Dimoff, had an expired license.

20. While Defendant Amarose was speaking with Dimoff, he allegedly detected a strong odor of an alcoholic beverage emanating from her breath.

21. Defendant Amarose asked Plaintiff Dimoff if she had anything to drink to which she responded she did.

22. Defendant Amarose requested Dimoff to exit her vehicle and participate in Standardized Field Sobriety Testing.

23.  At this time Dimoff's son began to cry as he continued to try to keep the dog calm and was frightened by the police interaction.

24. Dimoff explained to the Defendants Amarose and Tremaine that her husband was a police officer and she could call him to come pick up her son.

25. Dimoff was asked by Defendants Amarose and Tremaine to sit on the front of the police vehicle which was behind Dimoff's car.

26. Dimoff advised the Defendants she did not have her glasses on.

27. Defendant Amarose began to conduct the Horizontal Nystagmus Test (HGN) sobriety test.

28. During the test Defendant Amarose became verbally aggressive towards Plaintiff Dimoff insinuating and stating she was acting like a "bitch" and not cooperating.

29. Plaintiff Dimoff was cooperating to the best of her abilities, and was not resisting and/or fighting the Defendants at any moment.

30. The next test requested by the officer(s) was the Walk and Turn test.

31. Dimoff asked Defendant Amarose if she could get her glasses out of her vehicle, to which he responded no.

32. Officer Amarose showed Dimoff how to perform the test.

33. Due to her shoes, her balance and medical coordination issues, Plaintiff advised Defendants she probably could not perform this test well.

34. Dimoff had recently fell backwards on her home steps due to her medical condition where she was taken to the emergency room treated for a dislocated shoulder and needed stitches.

35. Dimoff performed the test the best she could while cooperating and returned to the front bumper of the police car to sit.

36. Plaintiff Dimoff requested numerous times for the Defendants to please check on her 11-year-old son who was still sitting in the vehicle with their dog.

37.  Defendant Amarose responded loudly "We will." Defendant Tremaine also responded "We will."

38. Defendant Amarose proceeded to illustrate the last sobriety test while aggressively yelling at Plaintiff Dimoff.

39. Defendant Tremaine reiterated what Defendant Amarose was stating echoing his aggressive behavior.

40. Plaintiff Dimoff conducted the test to the best of her ability.

41. Defendant Tremaine stated to Dimoff if she didn't continue to cooperate they were going to have to put handcuffs on her.

42. Plaintiff explained to the Defendants Amarose and Tremaine she was not being disrespectful and she was cooperating.

43. Defendants then asked Plaintiff Dimoff to conduct a breathalyzer test.

44. Defendant Dimoff cooperated blowing a .14 BAC.

45. Defendants told Plaintiff to turn around repeatedly yelling at her while Plaintiff was calmly standing there trying to understand why Defendants were yelling at her.

46. Defendant Tremaine grabbed the Plaintiff and aggressively swung her around onto the hood of the police car and then to the pavement to cuff her.

47. The entire time while the cuffing is happening, the Defendants continue to yell and curse at Plaintiff Dimoff.

48. Defendants threw Plaintiff onto the pavement knocking her face into the pavement causing her to break a tooth and have her teeth pushed into her gums. She also suffered abrasions to her face.

49. When Plaintiff was picked up from the pavement, she swallowed her tooth as she realized it was missing.

50. Plaintiff Dimoff was having a hard time concentrating and was very disoriented due to the injuries sustained from her head hitting the pavement.

51. Plaintiff Dimoff's mouth was filled with blood and gravel so she was repeatedly spitting the blood and gravel out so she would not swallow it.

52. As she was still disoriented and could hardly concentrate, Plaintiff Dimoff accidentally spit on Defendant Tremaine.

53. Immediately Defendant Tremaine began to yell at Dimoff, "You spit on me! You spit on me!"

54. Both Defendants began to yank and pull Plaintiff Dimoff and placed her in back of the police car while yelling obscenities at her.

55. For some time, the Defendants were having a discussion where it appeared they were having a disagreement.

56. One of the Defendants asked if Plaintiff Dimoff was on blood thinners because of the extent of the bleeding.

57. Plaintiff Dimoff's eyesight was not the best at this moment due not having her glasses on (which Defendant Amarose refused her permission

to get out of her vehicle) and also from the injuries sustained from the Defendants.

58. Plaintiff thus attempted to spit blood and gravel out of the window not realizing the window was closed.

59. Dimoff at no time was loud, disrespectful or non-compliant.

60. The Defendants next took Plaintiff to the hospital for blood testing.

61. After arriving at the hospital, Defendants yanked Plaintiff out the police car and dragged her across the parking lot to the entrance of the hospital.

62. As Plaintiff Dimoff waited to be seen, Defendant Amarose kept making inappropriate comments taunting Plaintiff and calling the Plaintiff a "bitch."

63. Plaintiff Dimoff eventually saw a nurse who took her blood pressure which was high due to Plaintiff's anxiety caused by the Defendants.

64. Defendant Amarose continued to antagonize the Plaintiff to the point where the nurse had to ask Defendant Amarose to leave the room and wait in the waiting area.

65. At this time Defendant Tremaine apologized to Plaintiff for taking her down to the pavement however Tremaine stated when he feels someone is resisting, he is required to take the person down.

66. Dimoff responded "Does it always go this far?"

67. Defendant Tremaine replied, "No."

68. Dimoff asked how it got out of hand when she was compliant the entire time.

69. Defendant Tremaine responded he wasn't sure what had happened and apologized to Plaintiff and stated "it got out of hand."

70. The nurses continued to monitor Plaintiff as her anxiety spiked and the nurses needed to make sure Plaintiff did not hyperventilate.

71. Plaintiff was next moved to a different room and both Defendants Amarose and Tremaine took Plaintiff's arms pulling her through the hall to mover her.

72. When they arrived to the room Plaintiff was told to sit on the bed. Plaintiff explained she did not feel stable enough to sit on a bed and asked to sit on a chair.

73. Plaintiff sat on the chair trying to collect her thoughts and concentrate on what was going on at the moment.

74. Defendant Amarose was told by Defendant Tremaine to wait in the hall.

75. Defendant Amarose was asked several times by the nursing staff to stop making inappropriate comments and peering into Plaintiff's room.

76. The Plaintiff had to use the restroom.

77. As both Defendants Amarose and Tremaine escorted Plaintiff to the restroom, Amarose again called Plaintiff a "bitch" and mumbled other inappropriate comments under his breath.

78. Tremaine glanced over to Amarose to signal him to calm down.

79. Defendant Tremaine continued to walk Plaintiff to the restroom.

80. Defendant Tremaine advised Plaintiff once they got to the police station there would be a female officer Plaintiff could speak with and explain everything that had happened.

81. Defendant Tremaine then shared with Plaintiff that he knew things got out of hand but had to comply with Defendant Amarose.

82. Coming back from the restroom Defendant Tremaine and Plaintiff Dimoff talked about how she spit on Tremaine.

83. Dimoff explained it was not on purpose and she apologized to Tremaine.

84. Dimoff and Tremaine retuned to the room.

85. Defendant Amarose stood outside of the room glaring at Plaintiff and speaking loudly to the nurses "how being an officer's wife got me far" and again calling the Plaintiff again a "stupid bitch" and an "out of control drunk."

86. Another officer then arrived, believed to be Officer Frantz.

87. Amarose and Frantz stood outside the room laughing and talking loudly and again Amarose stated "being an officer's wife doesn't mean squat to us."

88. The nurse took Plaintiff's blood for testing and then a doctor arrived to check Plaintiff's injuries.

89. The doctor suggested Plaintiff get a MRI for her head injury and a sonogram for swallowing a tooth however Plaintiff refused.

90. The Plaintiff understandably did not want to spend any additional time near or around the Defendants who caused her pain and anxiety.

91. Her injuries were serious and permanent and included but were not limited to the following:

   a. Front right tooth knocked out,
   b. Front left tooth and second tooth pushed into gums;
   c. Gum pain;
   d. Top teeth went through bottom lip causing upper and lower lip cuts and swelling;
   e. Multiple facial abrasions;
   f. Bleeding nose;
   g. Swelled knee along with abrasions;
   h. Right and left arm injury
   i. Elbow injured;
   j. Abrasions on left chest;
   k. Bruising on lower back; and
   l. Head wounds.

92. The nurse advised Plaintiff she could get dressed and leave.

93. When Plaintiff walked out of the room Amarose grabbed the Plaintiff's discharge papers and the Plaintiff advised Amarose they were her papers.

94. Defendant Amarose told Plaintiff to "shut up" and the papers now belonged to him.

95. Immediately Amarose yanked Plaintiff around pulling her arms behind her back and cuffing her tightly.

96. Both Defendants were pulling Plaintiff's arms very aggressively causing even more pain to the Plaintiff.

97. Amarose put the Plaintiff in the car and the seatbelt was placed tightly across the Plaintiff's neck.

98. When the Plaintiff asked for the seatbelt to be moved/loosened, Amarose called the Plaintiff a "bitch" and told Plaintiff to "shut up."

99. Once the Defendants and Plaintiff got to the police barracks, the Plaintiff sat on a bench while Defendant Tremaine handed Plaintiff paper towels for her bleeding mouth.

100.    While Amarose fingerprinted Plaintiff he continued to be very aggressive and became agitated and more abusive as he had to repeat the fingerprinting process several times as it was not working correctly.

101.    Plaintiff continued to bleed from her mouth and Defendant Amarose became further agitated but offered Plaintiff a dry paper towel. Plaintiff

declined due to the fact the dry paper towel would stick to the blood and her mouth.

102.   After the Plaintiff was fingerprinted, Amarose continued his sarcastic, inappropriate remarks while briskly walking to the car to take the Plaintiff to jail.

103.   Plaintiff tripped as she could not keep up with Amarose and then was slammed by the Defendant against the police cruiser, hitting her face causing her to get a black eye.

104.   Once they arrived at the county jail, a female officer took the Plaintiff into a room to be searched.

105.   Plaintiff told the female officer what was happening and the female officer responded, saying she could see what was happening and that is why she got the Plaintiff away from the Defendants and into another room.

106.   During Plaintiff's time in jail her anxiety spiraled out of control, she was unable to stay calm, and felt dizzy most of the time.

## CAUSES OF ACTION

### COUNT I – FEDERAL CIVIL RIGHTS VIOLATION

**4th and 14th Amendment – Excessive Force
Against Defendant Trooper Amarose, in his individual and official
capacity as a Chambersburg Pennsylvania State Trooper**

**Against Defendant Trooper Tremaine, in his individual and official
capacity as a Chambersburg Pennsylvania State Trooper
Against Defendant John Doe Supervisory Officers in their individual
and official capacities as Police Supervisory Officers**

107.    Plaintiff incorporates by reference paragraphs 1 through 106 of the

instant Complaint.

108.    Defendants are state actors who acted under color of state law and in a

manner that deprived Plaintiff of her Constitutional rights to be free from

excessive force without probable cause and due process of law as

guaranteed by the Fourth Amendment and Fourteenth Amendment to the

U.S. Constitution.

109.    Defendants engaged in excessive, unnecessary, and unreasonable

force, such force being the abusive and excessive handling of Plaintiff,

when inexplicably forcing the Plaintiff onto the ground and into the side

of the police cruiser multiple times on the date of the incident in question.

110.    As a direct and proximate result of Defendants' conduct, Plaintiff

sustained damages and suffered the following injuries:

a.  Violation of her constitutional rights under the 4th Amendment to the

United States Constitution;

b.  Severe physical injuries, emotional harm, humiliation, and pain and

suffering that occurred because of the unlawful force used; and

    c.  Loss of liberty and financial losses, including attorney fees, costs and

other expenses all to her detriment and harm.

WHEREFORE, Plaintiff prays that the Court grant judgment against all

Defendants for the following:

    A.  Enter a declaratory judgment, pursuant to Rule 57 of the Federal

Rules of Civil Procedure, stating that Defendants' actions have

subjected Plaintiff to excessive force in violation of 42 U.S.C. §1983.

    B.  Award compensatory damages to Plaintiff.

    C.  Award punitive damages to Plaintiff.

    D.  Award cost of suit to include disbursements and attorney's fees.

    E.  Grant such other and further relief as the Court deems fair and

equitable.

111.    A jury trial is hereby demanded as to this count.

## COUNT II – FEDERAL CIVIL RIGHTS VIOLATION

**4th and 14th Amendment – Excessive Force Supervisory Violations of
the 4th and 14th Amendment
42 U.S.C. §1983 and §1986
Against Defendant Trooper Amarose, in his individual and official
capacity as a Chambersburg Pennsylvania State Trooper
Against Defendant Trooper Tremaine, in his individual and official
capacity as a Chambersburg Pennsylvania State Trooper
Against Defendant John Doe Supervisory Officers in their individual
and official capacities as Police Supervisory Officers**

112.   Plaintiff incorporates by reference paragraphs 1 through 111 of the instant Complaint.

113.   Defendants acted in a manner that deprived Plaintiff of her constitutional right to be free of excessive force as guaranteed by the Fourth Fourteenth Amendment.

114.   Defendant John Does were supervisors of those Defendant Officers and/or of each other who engaged in excessive force who recklessly and knowingly failed to monitor and supervise the other Defendant Officers and therefore were deliberately indifferent to the rights of citizens.

115.   Defendants were supervisors of those Defendant Officers who engaged in excessive force who recklessly and knowingly failed to train or improperly trained the other Defendant Officers and therefore were deliberately indifferent to the rights of citizens.

116.   The Defendant supervisors permitted the aforementioned policies, practices, and customs, discussed herein to continue, which bred officers who routinely and brazenly violate the rights of the citizens with whom they have contact.

117.   Upon information and belief, Plaintiff alleges that Defendants knew the other Defendants routinely engaged in behavior that was likely to violate the 4th Amendment rights of Plaintiff.

118.    Defendants were aware of, but indifferent to, the unreasonable risk of harm to Plaintiff of a failure to adequately train police officers on the lawful use of force and arrests.

119.    Defendants' indifference to their supervisory authority over the lawful use of force and arrests policy was the moving force behind the causation of the violation of Plaintiff's Fourth and Fourteenth Amendment rights.

120.    The supervisory Defendants had a duty under 42 U.S.C. §1986 to report the civil rights violations which occurred on the date of the incident in question and therefore Defendants are liable.

WHEREFORE, Plaintiff prays that the Court grant judgment against all Defendants for the following:

A.    Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' actions have subjected Plaintiff to excessive force in violation of 42 U.S.C. §1983.

B.    Award compensatory damages to Plaintiff.

C.    Award punitive damages to Plaintiff.

D.    Award cost of suit to include disbursements and attorney's fees.

E.    Grant such other and further relief as the Court deems fair and equitable.

121.    A jury trial as to this count.

## COUNT III– FEDERAL CIVIL RIGHTS VIOLATION

**4th and 14th Amendment – Failure to Intervene Violations of the 4th and 14th Amendment**
**42 U.S.C. §1983 and §1986**
**Against Defendant Trooper Amarose, in his individual and official capacity as a Chambersburg Pennsylvania State Trooper**
**Against Defendant Trooper Tremaine, in his individual and official capacity as a Chambersburg Pennsylvania State Trooper**
**Against Defendant John Doe Supervisory Officers in their individual and official capacities as Police Supervisory Officers**

122.    Defendants Plaintiff incorporates by reference paragraphs 1 through 121 of the instant Complaint.

123.    Each Defendant knew or should have known that the other Defendants were engaging in excessive force in violation of Plaintiff's constitutional rights.

124.    None of the Defendants, despite knowing excessive force was being used, intervened to limit or stop the excessive force.

125.    Such inactions of the Defendants resulted in serious physical injury to the Plaintiff and violated her constitutional rights.

WHEREFORE, Plaintiff prays that the Court grant judgment against all Defendants for the following:

A.  Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' actions have subjected Plaintiff to excessive force in violation of 42 U.S.C. §1983.

B.  Award compensatory damages to Plaintiff.

C.  Award punitive damages to Plaintiff.

D.  Award cost of suit to include disbursements and attorney's fees.

E.  Grant such other and further relief as the Court deems fair and equitable.

126.  A jury trial as to this count.

## COUNT IV– SUPPLEMENTAL STATE CLAIMS

**Assault**
**Against Defendant Trooper Amarose, in his individual and official capacity as a Chambersburg Pennsylvania State Trooper**
**Against Defendant Trooper Tremaine, in his individual and official capacity as a Chambersburg Pennsylvania State Trooper**

127.  Plaintiff incorporates by reference paragraphs 1 through 126 as if fully set forth herein.

128.  Defendants intentionally caused Plaintiff to suffer imminent apprehension of harmful or offensive bodily contact.

129.  Defendants' actions were willful and malicious.

130.    As a result of Defendants' conduct, Plaintiff suffered and continued

to suffer pain and suffering, humiliation, emotional distress, and mental

anguish.

WHEREFORE, Plaintiff prays that the Court grant judgment against all

Defendants for the following:

A.   Enter a declaratory judgment, pursuant to Rule 57 of the Federal

Rules of Civil Procedure, stating that Defendants' actions have

subjected Plaintiff to excessive force in violation of 42 U.S.C. §1983.

B.   Award compensatory damages to Plaintiff.

C.   Award punitive damages to Plaintiff.

D.   Award cost of suit to include disbursements and attorney's fees.

E.   Grant such other and further relief as the Court deems fair and

equitable.

131.    A jury trial as to this count.

## COUNT V – SUPPLEMENTAL STATE CLAIMS

**Battery**
**Against Defendant Trooper Amarose, in his individual and official**
**capacity as a Chambersburg Pennsylvania State Trooper**
**Against Defendant Trooper Tremaine, in his individual and official**
**capacity as a Chambersburg Pennsylvania State Trooper**

132.    Plaintiff incorporates by reference paragraphs 1 through 131 as if fully

set forth herein.

133.   Defendants intended to cause offensive contact to Plaintiff.

134.   Defendants intended to cause harmful or offensive contact to Plaintiff by grabbing her aggressively and forcing her to the pavement causing severe injuries and then handcuffing her.

135.   Defendants' acts directly resulted in harmful and offensive contact to Plaintiff.

136.   Defendants' contact was offensive and would offend a reasonable person's personal sense of dignity.

137.   As a result of Defendants' conduct, Plaintiff suffered and continued to suffer pain and suffering, humiliation, emotional distress and mental anguish.

WHEREFORE, Plaintiff prays that the Court grant judgment against all Defendants for the following:

A.   Award compensatory damages to Plaintiff, including harm to her reputation, financial losses, emotion stress and mental anguish and humiliation.

B.   Award punitive damages to Plaintiff.

C.   Award cost of suit to include disbursements and attorney's fees.

D.   Grant such other and further relief as the Court deems fair and equitable.

138.   Jury trial as to this count.

WHEREFORE, Plaintiff respectfully demands judgment of the Defendants jointly and severally for the deprivation of his 4th and 14th Amendment rights to be free of excessive and unnecessary force, assault and battery while being taken into custody together with damage for pain and suffering, for humiliation and embarrassment, for emotional stress, fees, attorney's fees, and such other relief as the court may deem appropriate.

Dated: 01/13/2022                Respectfully submitted,


                                 /s/ Matthew L. Owens
                                 Matthew L. Owens, Esquire
                                 Law Offices of Matthew L. Owens, Esq. LLC
                                 I.D. No. 76080
                                 4409 N. Front St
                                 Harrisburg, PA  17110
                                 717-909-2500
                                 Email: mlowens@centralpaattorneys.com
                                 *Attorney for Jeri Lynne Dimoff*